**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**November 29, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CARLOS PORTILLO-QUEZADA,
also known as Luis Quezada,

Defendant-Appellant.

No. 05-3102

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 03-CR-20051-01-JWL)**

---

B. Kay Huff, Lawrence, Kansas, for Appellant.

Leon J. Patton, Assistant United States Attorney (Sheri McCracken, Assistant
United States Attorney, on the brief) Office of the United States Attorney, Kansas
City, Kansas, for Appellee.

---

Before **McCONNELL**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

---

**PER CURIAM**.

---

Carlos Portillo-Quezada appeals his jury convictions arising from his

leadership of a methamphetamine distribution ring in Kansas City, Kansas.

Portillo-Quezada claims the trial court erred in (1) allowing him to appear at voir

dire with two co-defendants who were wearing prison clothing; (2) failing to grant a mistrial when the prosecutor suggested at voir dire that his co-defendants looked like drug dealers; (3) allowing the government to present evidence of an uncharged murder on the grounds it was connected to the drug conspiracy; and (4) imposing an unreasonable sentence.

We disagree for the reasons discussed below and AFFIRM the district court.

## I. Background

This case arose from a Kansas City police investigation into a large scale methamphetamine distribution ring. Police suspected the ring was organized and operated by three brothers: Portillo-Quezada and Eloy and Raul Portillo. The three brothers employed numerous other individuals as part of a drug conspiracy to (1) buy and sell drugs; (2) obtain rental properties to use for drug transactions; (3) deliver product; and (4) collect and enforce debts owed to the conspiracy.

As part of the police investigation, on April 10, 2003 an undercover police officer purchased 55 grams of methamphetamine from Portillo-Quezada in a controlled buy. The undercover officer paid for the drugs with $3,000 in marked bills. The transaction took place at an apartment rented by Carl Rieger, a co-conspirator of Portillo-Quezada, which was rented for the purpose of providing a "storefront" for methamphetamine distribution. At that time, police also

suspected that members of the conspiracy were involved in the murder of Bruce Andrews, whose bullet-riddled body had been discovered on April 8.

Six hours after this transaction, Kansas City police executed a search warrant on Rieger's apartment. The officers executing the search found Portillo-Quezada hiding in a bedroom closet wearing body armor and holding a loaded 9-millimeter handgun. Methamphetamine was scattered about the apartment in plain view.

Portillo-Quezada was arrested and searched. Police found on him $1,390 cash, including $1,090 of the marked bills used by the undercover agent earlier that night. Portillo-Quezada's brother, Eloy Portillo, was also arrested at the apartment after he was found with drugs, $4,600 cash, and two receipts for the rental of a trailer later found to have been used by the conspiracy for distribution and storage. Several other individuals were arrested as a result of the raid, either at the apartment or elsewhere based evidence found at the apartment.

Several days later, police questioned Noe Espino, whom police suspected was part of the drug ring. Espino was arrested after he confessed in a police interview that Portillo-Quezada paid him to locate Andrews, the murder victim, and assist in his killing. Espino disclosed that he lured Andrews into a car with the promise of methamphetamine and stolen wheel rims, took him to a vacant lot where Portillo-Quezada shot Andrews at least three times at point-blank range with an assault rifle. Espino told the police that he then assisted Portillo-Quezada

in removing Andrews's body, cleaned the car's windshield, and then burned the car. He admitted Portillo-Quezada paid him $1,000 cash and one half-ounce of methamphetamine for these acts.

Portillo-Quezada and Espino were tried alongside a third co-defendant, Kenneth Waterbury. Waterbury's role in the conspiracy was to sell and deliver drugs. At trial, a key witness, Rieger, testified that Portillo-Quezada admitted paying Espino $4,000, half of which was in the form of wheel rims, to help kill Andrews. Rieger also testified that Portillo-Quezada told him that he believed Andrews was responsible for the arrest of his brother Raul Portillo on separate drug charges. Another witness, Stephen Ballard, testified to conversations with Portillo-Quezada in which Portillo-Quezada disclosed a desire to kill Andrews because he owed Portillo-Quezada money for drugs he had stolen. Ballard testified to another conversation in which Portillo-Quezada told him that he "killed that [] Bruce." Supp Vol. IV at 314.

A jury convicted all three defendants for their role in the conspiracy. Portillo-Quezada was convicted of: (1) conspiracy to distribute in excess of 500 grams of methamphetamine in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii); (2) distribution of five or more grams of methamphetamine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii); (3) possession with intent to distribute five or more grams of methamphetamine in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and

842 (b)(1)(B)(viii); and (4) possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A).

## II. Analysis

Portillo-Quezada claims the district court erred at trial in two ways. First, he contends the court violated his due process rights when it allowed two co-defendants to appear before the jury pool in prison clothing. That error was compounded, he claims, by the prosecutor's later reference to the way "drug dealers" look, a thinly veiled comment on the appearance of Portillo-Quezada's co-defendants. Second, he argues the district court erred in admitting testimony connecting the murder of Bruce Andrews to the drug conspiracy. Portillo-Quezada also claims that the court erred by imposing an unconstitutional sentence or, in the alterative, a sentence unreasonable under *United States v. Booker*, 543 U.S. 220 (2005).

We address each argument in turn.

## A. Voir Dire

### 1. Appearance in Prison Clothing

On the first day of trial, Portillo-Quezada's co-defendants, Espino and Waterbury, appeared in the court room in prison clothing apparently because friends or family had been unable to arrive in time with a clothing change. Portillo-Quezada wore street clothes. Before voir dire questioning began, the district court asked the defendants if they were prepared to proceed with voir dire

-5-

given Espino's and Waterbury's appearance.  Each of the three defendants agreed

to proceed.[1]  Sometime during a break in questioning later in the day, Espino

---

[1] The following exchange took place prior to voir dire:

THE COURT: My next question is to ask whether you're ready to proceed to trial.  I note that two of the defendants remain in their prison garb.  What's your situation?

MR. DONHAM: Judge, on behalf of Mr. Waterbury, his fiancee, Ms. Rush, was supposed to arrive early this morning with a set of clothes. I attempted to contact her.  There was no answer on her cell phone. Ms. Scheurer has contacted her, woke Ms. Rush up, so it doesn't appear that she's going to be here on time with clothing.

THE COURT: Mr. Dunn?

MR. DUNN: We're content to go ahead in jail clothes, but my client's mother, when we heard there might be a delay for Mr. Waterbury, rushed back to her place at 2400 Park to try to get some clothes for Noe [Espino].

THE COURT: Mr. Donham, are you prepared to proceed then at this time?

MR. DONHAM: Yes, sir.

THE COURT: Mr. Dunn, so is the defendant Espino?

MR. DUNN: That is correct.

THE COURT: And is the defendant Portillo-Quezada prepared to proceed?

MR. DEDMON: Yes, your Honor.

THE COURT: And the government, is it prepared to proceed?

(continued...)

changed into civilian clothes. Waterbury, however, remained in prison clothing throughout the voir dire. Before ending voir dire, the court also asked members of the jury pool whether the defendants' appearance in prison garb would prejudice them. The potential jurors assured the court they would be impartial at trial. Each of the defendants passed the jury for cause.

Since Portillo-Quezada did not object at voir dire, we review for plain error. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005). Plain error exists only when there is (1) error, (2) that was plain, (3) affecting substantial rights, and (4) going to the fairness, integrity or public reputation of the judicial proceedings. *Id.*

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). The Constitution therefore prohibits any courtroom procedure that "undermines the presumption of innocence and the related fairness of the factfinding process." *Deck v. Missouri*, 544 U.S. 622, 630 (2005). It is well-settled that defendants who are compelled to appear before the jury in handcuffs, shackles or prison attire suffer prejudice

---

[1](...continued)
MS. McCRACKEN: Yes, sir.

THE COURT: Under those circumstances then let's call in the prospective jurors.

Vol. V at 3–4.

which unconstitutionally undermines the presumption of innocence.  In *Estelle*, for example, the Supreme Court found due process was compromised by "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire."  425 U.S. at 504–05.  Similarly, in *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986), the Court found that "prison clothes are unmistakable indications of the need to separate a defendant from the community at large" and violate the right to a fair trial.  Trial courts must avoid "the sort of inherently prejudicial practice[s]" that undermine the presumption of innocence by giving the jury the impression that the defendant is guilty.  *Id.* at 560.

Portillo-Quezada did not wear prison clothing at voir dire or anytime during trial.  He contends, however, he was prejudiced by his association with the co-defendants who wore prison garb.  We disagree.

First, even if there was error, it was invited by the defendants.  The district court explicitly asked all three defendants if they wanted to proceed with voir dire despite Espino's and Waterbury's appearance.  Each defendant acquiesced.  A party cannot induce "action by a court and later seek[] reversal on the ground that the requested action was error."  *United States v. Edward J.*, 224 F.3d 1216, 1222 (10th Cir. 2000).  "'Having induced the court to rely . . . a party . . . may not at a later stage . . . use the error to set aside the immediate consequences of the error.'"  *United States v. DeBerry*, 430 F.3d 1294, 1302 (10th Cir. 2005) (*quoting Fryman v. Fed. Crop Ins. Corp.*, 936 F.2d 244, 249 (6th Cir. 1991).  Portillo-

Quezada cannot now complain he was prejudiced by an error he invited from the court.

Second, the Supreme Court has been quite clear that a defendant's failure to object to trial proceedings conducted in prison garb "negate[s] the presence of compulsion necessary to establish a constitutional violation." *Estelle*, 425 U.S. at 512–13. In other words, a defendant can be tried in prison clothing if he so chooses. Here, Portillo-Quezada and his co-defendants chose to proceed with voir dire despite the court's implied offer to postpone the proceedings on account of Espino's and Waterbury's appearance. Their choice was entirely voluntary.

Finally, even if the procedure raised concerns of prejudice, the district court dispelled them. The court polled the jury and created a record showing the jury was uninfluenced by seeing Espino and Waterbury in prison clothing. Portillo-Quezada asked no questions of the jury pool about bias arising from the circumstances or in any way elicited evidence the jury was in fact prejudiced against him. Any potential prejudice is further attenuated by the fact that Portillo-Quezada was in civilian clothes, not prison garb, throughout voir dire and trial.

Accordingly, we find no error in the district court's decision to go forward with voir dire upon Portillo-Quezada's consent.

## 2. Prosecutor's Statements

Also during voir dire, the prosecutor made the following comment to the jury pool:

> Finally, many of us have in our minds what the picture of a criminal is. They have big tattoos and guns and etc., and we expect them to have long hair, and they wear biker jackets and that kind of thing. Is anybody sitting there going, if someone doesn't look-

Vol. V. at 107. Before the prosecutor could finish her comment, Espino's lawyer objected, arguing that Espino had visible tattoos and the comments served to "profile" him as a drug dealer. After Waterbury (who also had tattoos) and Portillo-Quezada (who had no visible tattoos) joined the objection, the three moved for a mistrial.

The district court denied these motions but instructed the prosecutor to make a curative statement. The prosecutor then admonished the potential jurors,

> Ladies and gentlemen of the jury, let me just clarify. I am not saying that drug dealers look a certain way. I'm saying that some people have perceptions of what criminals look like. I am not saying that drug dealers have tattoos. I am not saying that drug dealers carry guns. Absolutely not. My remarks are not evidence. I am saying that some people have pictures in their minds of what a criminal looks like. Because of that they decide that somebody is guilty or not guilty based on that picture. Does everybody agree they will put aside the picture in their mind of what a criminal looks like and listen to the evidence and decide their verdict based on that evidence, not on some picture that you have of what a criminal must look like? Does everybody understand that that's what we have to focus on? If not, would you raise your hand?

Id. at 109–10. After this admonishment, the district court followed with its own comments:

-10-

I just want to add, members of the jury, that, just as I indicated to you earlier that the concept of being equal before the eyes of the law applies to things like nationality or ethnicity, so too does it apply to appearance. People don't come before a court and stand trial based upon how they look or how they behave other than their actions that are actually charged or proven in a case. So it would be wrong, it would be a violation of your sworn oath as a juror to find somebody guilty because you didn't like their looks or because of the way they looked or the way they dressed or their appearance or what a prosecutor told you he or she thought drug dealers looked like, that sort of thing. Is there anybody that believes that you think that you would have any difficulty judging this case solely on the evidence and setting aside appearances, good or bad, that you may perceive of people and listen and watch behaviors and those kinds of things? Anybody think you would have difficulty with that?

Id. at 110–11.

Nevertheless, Portillo-Quezada maintains that the district court abused its discretion by failing to declare a mistrial. We review the district court's denial of his motion for abuse of discretion. *United States v. Broomfield*, 201 F.3d 1270, 1276 (10th Cir. 2000); *United States v. Maynard*, 236 F.3d 601, 604 (10th Cir. 2000).

As a preliminary matter, we agree that it is improper for a prosecutor to appeal to stereotypes based on appearance. The prosecutor referenced a physical characteristic and appeared to link this characteristic to drug dealers in general. Whether careless or intentional, these remarks were improper.

Nonetheless, we conclude that the prosecutor's comments did not unconstitutionally prejudice Portillo-Quezada's right to a fair trial. In determining whether prosecutorial misconduct affected the outcome of a trial, we

-11-

consider three factors within the context of the case as a whole: (1) the curative acts of the district court, (2) the extent of the misconduct, and (3) the role of the misconduct. *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996). None of the three factors suggest reversible error.

First, the district court acted promptly and forcefully to cure the statement. It required the prosecutor to rephrase her voir dire statement to remove any false impression and the court itself provided a strong admonition. The court's actions, "closely followed the prosecutor's improper statements and sufficiently disabused the jury of any misimpression created by the prosecutor's inartful [statements]." *United States v. Harlow*, 444 F.3d 1255, 1266 (10th Cir. 2006).

In addition, the prosecutor's statement, which Portillo-Quezada characterizes as profiling, does not refer to any of *his* physical characteristics, attenuating a claim of guilt by association. More importantly, after the incident the prosecutor made no further attempts at trial to capitalize on the remarks or refer to the defendants' appearances. It is hard to say that the comment had an affect on the trial given the substantial evidence of the defendants' role in the drug conspiracy.[2]

In sum, the prosecutor's statement, in this context, is not of "sufficient significance to result in the denial of the defendant's right to a fair trial."

_____

[2] In any event, the reference was harmless. The evidence presented at trial of Portillo-Quezada's culpability was overwhelming.

*Maynard*, 236 F.3d at 606 (internal quotations omitted). As we have often observed, "The Constitution guarantees a defendant a fair trial, not a perfect one." *United States v. McHorse*, 179 F.3d 889, 904 (10th Cir. 1999). The isolated remark of the prosecutor during voir dire did not render Portillo-Quezada's trial unfair.

## B. Murder Evidence

Prior to trial, Portillo-Quezada filed a motion in limine to prevent the presentation of testimony and evidence regarding the murder of Bruce Andrews. The motion contended that the evidence of uncharged conduct was inadmissible under Federal Rule of Evidence 404(b). The district court denied this motion before trial, holding that the evidence was intrinsic to the conspiracy and, therefore, not subject to Rule 404(b). The court, however, limited the government from introducing evidence about the murder beyond the general nature of Andrews's killing, and from naming Portillo-Quezada as the gunman.[3] On appeal, Portillo-Quezada argues that the prosecution violated the court's order by introducing evidence beyond its scope, and the graphic nature of the evidence prejudiced the jury. We disagree.

Captain John Cosgrove, the Kansas City police officer who interviewed Espino, testified about Espino's confession to his role in Andrews's murder.

---

[3] Based on the trial court's prior rulings under *Bruton v. United States*, 391 U.S. 123 (1968) (admissibility of co-conspirator's confession), the interviewing officer was not allowed to name Portillo-Quezada in his trial testimony.

Cosgrove's testimony established the following motives for the murder: (1) to punish Andrews for failing to pay money owing to the conspiracy, and (2) revenge for disclosing Raul Portillo's drug activity to police. Cosgrove testified that Espino described the killing and the subsequent disposal of the car in which the crime occurred. Some of the account was graphic—Cosgrove stated that Espino claimed he cleaned "blood and brains" from the windshield of the victim's car after the murder. Supp. Vol. V at 53.

Portillo-Quezada did not object to Cosgrove's testimony until after the government had concluded its direct examination. Although counsel objected that the testimony exceeded the court's order in limine, he did not ask for a mistrial at the time, nor did he move to strike the testimony or suggest a curative instruction. Portillo-Quezada eventually moved for a mistrial at the close of the government's case. The district court denied the motion finding that the evidence was in context "probably not that shocking [for] this jury to have heard . . . . I do not believe it in any way undermines the fairness of this trial or unfairly prejudices those individuals who are alleged to have had some role in murdering Mr. Andrews." Id. at 69–70.

We review the district court's admission of evidence for abuse of discretion. *United States v. Shumway*, 112 F.3d 1413, 1419 (10th Cir. 1997). We will not reverse a district court's decision to admit evidence if "it falls within the bounds of permissible choice in the circumstances" and is not "arbitrary,

capricious or whimsical." *Id*. We review a district court's denial of a mistrial for abuse of discretion. *Gabaldon*, 91 F.3d at 93–94.

The murder evidence was not barred by Rule 404(b). While Rule 404(b) precludes evidence of "other crimes, wrongs or acts," it does not apply to testimony offered as direct evidence of charged crimes. In a conspiracy prosecution, uncharged acts "committed in furtherance of the charged conspiracy are themselves part of the act charged." *United States v. Green*, 175 F.3d 822, 831 (10th Cir. 1999). Such evidence is "therefore intrinsic [to the crime] and simply does not implicate the requirements of 404(b)." *Id*. In sum, conduct which occurs during the life of a conspiracy and is a part of the same is direct evidence of the conspiracy and therefore not subject to Rule 404(b). *United States v. Pace*, 981 F.2d 1123, 1135 (10th Cir. 1992).

The facts in *United States v. Green*, *supra*, help illustrate this point. In *Green*, a co-defendant argued against the admission of evidence he threatened a co-conspirator with a firearm in order to collect missing drug profits. The district court allowed testimony about the defendant's use of threats at gunpoint, a strip search for hidden money, and conversations about a possible murder. We found no error, concluding the "evidence of [the defendant's] attempt to collect missing profits from [co-conspirators] is intrinsic to the conspiracy charged." *Green*, 175 F.3d at 831.

The murder evidence in this case is admissible for the same reason. The prosecution presented testimony that Andrews (1) owed Portillo-Quezada money for drugs stolen from a vehicle belonging to Portillo-Quezada, and (2) revealed to police the role of Portillo-Quezada's brother in the conspiracy. The testimony further showed that Espino served the conspiracy in an "enforcer" role, and that Portillo-Quezada used monies from the conspiracy to compensate Espino for his aid in killing Andrews. As in *Green*, Andrews's murder was evidence of Portillo-Quezada's "attempt to collect missing profits" owing to the conspiracy. Moreover, the display of force also could serve to intimidate others who might have considered cheating the conspiracy, again furthering its aims.

Given this testimony, the district court did not abuse its discretion in admitting the murder evidence as direct proof of the conspiracy and Portillo-Quezada's willingness to employ violence to ensure the conspiracy's success. *See also United States v. Miller*, 116 F.3d 641 (2d Cir. 1997) (upholding admission of evidence of several murders in RICO prosecution of organized cocaine distribution ring on theory of conspiracy); *United States v. Baptiste*, 264 F.3d 578 (5th Cir. 2001), *amended by* 309 F.3d 274 (5th Cir. 2002) (upholding admission of murder evidence where defendants were charged with conspiracy to distribute crack cocaine).

Portillo-Quezada also argues the evidence was unduly prejudicial. We test for unfair prejudice using a balancing test under Federal Rule of Evidence 403.

-16-

*See United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001). To be excluded, evidence must do more than "damage the [d]efendant's position at trial." *Id.* It must "make[] a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or [innocence] of the crime charged." *Id.* at 1212. "[E]xclusion of evidence under Rule 403 . . . is an extraordinary remedy and should be used sparingly." *Id.* at 1211. To be a basis for mistrial, the evidence "must have an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Martinez*, 938 F.2d 1078, 1082 (10th Cir. 1991) (internal quotations omitted).

The murder evidence here, while graphic, was not unduly prejudicial. The district court, in considering this objection, concluded the testimony did not shock the jury given the evidence Andrews had been shot with an assault rifle at close range in a car. The court found the reference to the crime scene's grisly nature was therefore not surprising to the jury in context, and the murder evidence was otherwise probative to show the scope of the conspiracy and demonstrated the lengths to which Portillo-Quezada was willing to go to protect the conspiracy's interests.

In the circumstances here, the district court did not abuse its discretion in refusing to grant a mistrial.

-17-

**C. Sentencing Error**

Finally, Portillo-Quezada makes two arguments challenging the life sentence imposed by the district court. First, he contends the sentence violates the Ex Post Facto Clause of the Constitution because the district court increased his sentence under the murder enhancement provision to the United States Sentencing Guidelines, USSG §§ 2D1.1(d)(1) and 2A1.1. Although the Guidelines were advisory at the time of sentencing, *see United States v. Booker*, 543 U.S. 220 (2005), he argues the murder enhancement amounts to retroactive punishment because the Guidelines were mandatory at the time of his criminal activity. This argument supposes that he should have been sentenced under a mandatory Guidelines regime and that the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004) required that murder be charged and proven to a jury in order for it to enhance a mandatory Guidelines sentence.

He also argues that even if the sentence is constitutional, it is unreasonable under the factors set forth in 18 U.S.C. § 3553(a). We disagree with both arguments.

**1. Ex Post Facto and Due Process Objections**

The Ex Post Facto Clause encompasses "[e]very law that changes the punishment, and inflicts greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull*, 3. U.S. (3 Dall.) 386, 390 (1798). While the prohibition on laws with retroactive effect is generally a "limitation upon the

powers of the Legislature," *Marks v. United States*, 430 U.S. 188, 191 (1977), the Supreme Court has acknowledged ex post facto limitations on judicial decision making. *Rogers v. Tennessee*, 532 U.S. 451 (2001); *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964). Limits on ex post facto judicial decisions are based upon the "core due process concepts of notice, [forseeability], and, in particular the right to fair warning." *Rogers*, 532 U.S. at 451.

Portillo-Quezada's argument is that retroactive application of *Booker* allowed the district court to inflict greater punishment for his conspiracy than it otherwise could have. This argument is foreclosed by our decision in *United States v. Rines*, 419 F.3d 1104 (10th Cir. 2005), in which we concluded that retroactive application of the advisory Guidelines regime does not violate the ex post facto component of the Due Process Clause.[4] We offer a few additional thoughts pertinent to this case.

At the time Portillo-Quezada engaged in the conspiracy for which he was convicted the statutory maximum sentence was life in prison. As it happens, were Portillo-Quezada sentenced after *Blakely*, but prior to *Booker*, the Guidelines regime in effect at the time may have resulted in a sentence below the statutory maximum. Nonetheless, the Supreme Court's decisions in *Blakely* and *Booker* did nothing to alter the statutory maximum sentence, and therefore did not alter

---

[4] We have consistently rejected similar arguments. *See United States v. Herula*, 464 F.3d 1132, 1138 (10th cir. 2006) (quoting *Rines*).

-19-

Portillo-Quezada's exposure to punishment. Thus, the sentence imposed in accordance with *Booker* does not offend ex post facto principles.

In addition, every other circuit to consider this issue has agreed with us. *See, e.g., United States v. Lata*, 415 F.3d 107 (1st Cir. 2005) (rejecting argument that due process prohibits the retroactive application of *Booker* on grounds that the defendants had fair warning of the statutory maximum in the pre-*Booker* environment); *United States v. Vaughn*, 430 F.3d 518 (2d Cir. 2005) (same); *United States v. Scroggins*, 411 F.3d 572, 576 (5th Cir. 2005) (rejecting ex post facto claim to post-*Booker* sentencing); *United States v. Jamison*, 416 F.3d 538 (7th Cir. 2005) (rejecting ex post facto claim on reasoning that *Booker* affects only punishment, not guilt or innocence); *United States v. Wade*, 435 F.3d 829 (8th Cir. 2006) (rejecting argument because defendant would have reasonable expectations of judicial factfinding in pre-*Blakely* environment when crime was committed); *United States v. Dupas*, 417 F.3d 1064 (9th Cir. 2005), *amended by* 419 F.3d 916 (9th Cir. 2005) (rejecting ex post facto claim on fair warning grounds); *United States v. Duncan*, 400 F.3d 1297 (11th Cir. 2005) (holding that *Booker* does not act to impermissibly increase the authorized sentence of a defendant where the defendant's ultimate exposure did not change); *United States v. Alston-Graves*, 435 F.3d 331 (D.C. Cir. 2006) (rejecting argument on grounds that defendant had fair warning of statutory maximum in pre-*Booker* environment).

We agree with these cases that where a defendant's exposure to punishment has not changed, sentencing under *Booker* does not amount to ex post facto judicial decision making in violation of the Due Process Clause.

**2. Reasonableness under 18 U.S.C. § 3553(a)**

We review sentences for reasonableness in light of the factors set forth in 18 U.S.C. § 3553(a). *United States v. Galarza-Payan*, 441 F.3d 885, 887 (10th Cir. 2006). A properly calculated Guideline sentence is "entitled to a rebuttable presumption of reasonableness." *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006) (per curiam). In evaluating a district court's calculation of the applicable Guideline range, we review its factual conclusions for clear error and its legal conclusions de novo. *Id.* at 1054.

At his sentencing hearing, Portillo-Quezada was sentenced to life in prison for conspiracy, 480 months for distribution and possession with intent to distribute methamphetamine and 60 months for possession of a firearm in furtherance of a drug trafficking offense.[5] The district court also concluded Portillo-Quezada was subject to life imprisonment on the basis of the murder enhancement contained in USSG §§ 2D1.1(d)(1) & 2A1.1. In announcing the sentence, the court found it would have reached the same sentence on the basis of

---

[5] The firearm sentence was set to run consecutively to the drug sentences, which were set to run concurrently.

the amount of drugs involved and Portillo-Quezada's leadership role in the conspiracy.[6]

Portillo-Quezada contends his sentence is unreasonable because the court failed to exercise independent discretion under 18 U.S.C. § 3553(a) by giving great weight to the now advisory sentencing guidelines. This argument is foreclosed by our recent decision in *United States v. Terrell*, 445 F.3d 1261, 1265 (10th Cir. 2006), where we held a district court does not commit error when it gives a "high degree of weight to the Guidelines in its sentencing decisions." In addition, the sentence was within the statutory and Guidelines range and is therefore presumed to be reasonable. Portillo-Quezada has presented nothing to suggest the district court committed clear error or otherwise failed to consider the § 3553(a) factors.

Accordingly, we conclude that Portillo-Quezada's sentence is reasonable.

---

[6] Portillo-Quezada also contends the district court erred when it calculated the amount of drugs attributable to him. We disagree. As the district court noted at sentencing, "The drug quantities attributable to a defendant convicted of a conspiracy are established on the basis of the quantity of drugs which the defendant reasonably foresaw or which fell within the scope of the defendant's agreement with the conspirators." Vol. V. at 1516 citing *United States v. Roberts*, 14 F.3d 502, 522 (10th Cir. 1993). In calculating the quantity of drugs which may be attributed to a defendant, the sentencing court may consider a wide range of information so long as it bears the "minimum indicia of reliability" to support its probable accuracy. *United States v. Browning*, 61 F.3d 752, 755 (10th Cir. 1995). Estimates of drug quantities for which a defendant will be held accountable are acceptable so long as supported by the facts. *United States v. Richards*, 27 F.3d 465, 469 (10th Cir. 1994); USSG § 2D1.1, cmt. 12. The district court explained its estimation of the quantity and purity of methamphetamine was based on testimony presented at trial.

### III. Conclusion

For the foregoing reasons, we AFFIRM.