**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 8, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

RICKY HENRY CISNEROS, a/k/a Ricky
Cisneros,

    Defendant - Appellant.

No. 14-1440
(D.C. No. 1:12-CR-00242-WJM-4)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **SEYMOUR**, and **PHILLIPS**, Circuit Judges.
_____

On May 23, 2012, a grand jury returned a twenty-two count indictment

charging Ricky Cisneros and ten other defendants with, among other crimes,

engaging in a conspiracy to distribute and possess with intent to distribute

methamphetamine in violation of 21 U.S.C. §§ 841, 846. Mr. Cisneros proceeded

to trial alone on the conspiracy charge. He appeals his conviction, and we affirm.

Before trial, Mr. Cisneros filed a motion in limine seeking to exclude any

reference to the murder of Patricio Archuleta, one of the co-conspirators. The

court granted the motion "to the extent it [sought] to preclude any evidence tying

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Defendant Cisneros to the murder of Patricio Archuleta," but denied it "to the extent it [sought] to preclude all mention of Mr. Archuleta's murder." Rec., vol. 5 at 11. The court reasoned that "[t]o forbid any mention of the fact that Mr. Archuleta was murdered would unnecessarily confuse the jurors" because Mr. Archuleta "was at the center of [the] drug conspiracy." *Id.*

Just prior to opening statements, the district court instructed the jury that, while they would hear testimony regarding Mr. Archuleta and his drug-related activities, Mr. Archuleta would not be "participating in this trial because he was murdered in September 2011." Rec., vol. 3 at 31. The court also told the jury that it "should not consider Mr. Archuleta's murder in any way when determining whether the Government has proven beyond a reasonable doubt that the defendant, Mr. Cisneros, is guilty of the crimes charged in this case." *Id.* The court repeated this instruction at the end of the trial.

The government first mentioned Mr. Archuleta's murder during opening statements, stating, "You won't hear from Patricio Archuleta. . . . [A] lot of people will tell you about him, but he's not here because he was murdered." *Id.* at 32. Mr. Cisneros did not object to this reference to Mr. Archuleta's murder.

The jury heard testimony from Tanessa Cole, an unindicted co-conspirator who once dated Mr. Archuleta. She testified to using meth with Mr. Archuleta regularly and stated that Mr. Archuleta sold meth for a living. She also testified to going on drug runs with Mr. Archuleta, approximately five times, to Mr. Cisneros' apartment complex. Although she never witnessed a transaction

2

because she always stayed in the car, she said that Mr. Archuleta would come back with a "sandwich baggy [of meth] . . . the size of a baseball." *Id.* at 127. Ms. Cole would store the meth in her bra until she and Mr. Archuleta got back to his apartment, where he would put the meth in his safe. She also testified that Mr. Archuleta had to find a new source for drugs because he owed Mr. Cisneros too much money. When she could not remember the date Mr. Archuleta started using a different meth supplier, the government asked, "This new drug source, was this closer to when Pat was murdered or closer to when you first met Pat?"[1] *Id.* at 132.

Reyna Mendoza, a co-conspirator, offered even more damning evidence against Mr. Cisneros. Ms. Mendoza testified that she started selling meth to Mr. Cisneros on October 30, 2009, and that their relationship developed into a romantic one. She said that she initially supplied Mr. Cisneros with small amounts of meth. She also corroborated Ms. Cole's testimony regarding where Mr. Cisneros lived and the fact that he was Mr. Archuleta's source for drugs. She testified that she stopped selling meth to Mr. Cisneros because he owed her money, and that she started selling meth to Mr. Archuleta because Mr. Cisneros

---

[1] Mr. Cisneros made an oral motion for mistrial based on this testimony and also subsequently filed a written motion for a new trial asserting, among other things, a violation of the order regarding Mr. Archuleta's murder. The district court denied both motions. In denying the motion for new trial, the court "agree[d] with Defendant that Ms. Cole's testimony was somewhat unfairly prejudicial against the Defendant," but "considering the entire trial, the Court [did] not find that this unfair prejudice denied Defendant the right to a fair trial." Rec., vol. 1 at 680.

had dropped him as a client due to a $70,000 drug debt Mr. Archuleta owed him.

The prosecution presented exhibits of texts between Mr. Cisneros and Ms. Mendoza. In one, Mr. Cisneros said, "Hey, friend, call me when you get a chance. I have some work I want you to see." *Id*. at 247. Ms. Mendoza explained that "work" was a reference to meth. The prosecution presented another text which read, "When you get caught up, don't cry to me[,]" *id*. at 250, which Ms. Mendoza explained was Mr. Cisneros warning her that Mr. Archuleta would not pay for the meth she was providing him.

A third witness and co-conspirator, Christina Malmgren, testified to developing a close relationship with Mr. Archuleta in which they would "hang out" and "get[] high." *Id*. at 312. She knew he was a drug dealer, and he sometimes fronted meth for her to sell. She further testified that she saw Mr. Cisneros at Mr. Archuleta's apartment and that the two men went into the kitchen. While she could not quite see because the kitchen had an island counter, she figured "they were doing a drug deal." *Id*. at 323.

Finally, another unindicted co-conspirator, Vanessa Chauarin testified that she dated Mr. Archuleta and was aware that he sold meth for a living. She stated that, on a typical day, "a couple dozen" people would show up at Mr. Archuleta's apartment to buy meth. *Id*. at 368. She said Mr. Cisneros would come to Mr. Archuleta's apartment and the two would go over Mr. Archuleta's records of people who owed him money for meth. Ms. Chauarin testified that Mr. Cisneros and Ms. Mendoza came to Mr. Archuleta's house and he paid them approximately

4

$10,000 for meth.  She bolstered the testimony of Ms. Mendoza by saying that

Mr. Archuleta "always owed [Mr. Cisneros] money."  *Id.* at 379.

During its rebuttal closing argument, the government discussed the many

lives Mr. Cisneros had ruined:

> Mr. Phillips: Oh he's guilty, and you know it, and I am going to talk to you briefly about it. But when you consider lives that are ruined, this defendant ruined his life. This defendant ruined their lives. This defendant ruined some of the lives you heard up there on the stand.
>
> . . . .
>
> He's been exposed. He's no longer see-through. And ladies and gentlemen, today justice reigns, and you will find the defendant guilty, because he is guilty. And today no more lives are going to be ruined. He will be stopped.

Rec., vol. 3 at 521-27.  Mr. Cisneros objected and moved for a mistrial.  In

response, the government justified its comments by claiming they were invited

because the defense had asked the jury in its closing argument not to ruin Mr.

Cisneros' life based on the dearth of evidence presented at trial.

After the government's closing argument, one of the jurors expressed

concern for her safety.  Specifically, the juror noticed a man in the gallery whom

she recognized and believed to be a friend of defendant.  She initially stated she

did not fear for her safety, but she later changed her story and said she did fear

for her physical safety.  Both sides agreed that the juror should be excused and

also agreed that the court should inquire into whether she had tainted the rest of

the jury with her story of an intimidating spectator.  The court questioned the

5

juror as follows:

> The Court: [H]ave you disclosed or discussed in any way with any of your 11 colleagues on the jury any concern that you have or may have with respect to your physical safety or physical retribution or retribution of any kind?
>
> Juror: I did not tell them that I--- I asked if they felt that there was a possibility.
>
> The Court: Okay. That was not my question. My question is what you just told me and the lawyers and the parties, that you have some concern for your physical safety, of retribution, in rendering a verdict in this case, I am asking you whether you discussed that with any of your 11 colleagues, of your own personal concerns.
>
> Juror: My own personal? I think that by asking the question I think it showed that it was personal. Okay? I didn't tell them specifically.
>
> The Court: All right. So you did not discuss with them a personal concern for your safety?
>
> Juror: No, just as – I – I asked if anyone else –
>
> The Court: You raised it as a rhetorical question?
>
> Juror: I did. I did.

Rec., vol. 4 at 22-23.

After the juror was excused, Mr. Cisneros made another motion for mistrial, claiming the juror had tainted the entire panel. Mr. Cisneros said he had to presume the "statement by itself [was] an indicator of taint" since the court denied his requests to query the remaining jurors. *Id.* at 29. The district court denied the motion because the juror had "made it very clear three times on the record that she did not inform anyone else on the jury of her personal concerns." *Id.* at 31.

On appeal, Mr. Cisneros raises three issues: (1) the district court erred by allowing any reference to the fact that Mr. Archuleta was murdered instead of merely stating that he had passed away; (2) Mr. Cisneros was deprived of his due

6

process right to a fair trial by the cumulative effect of the government's repeated violations of the court's exclusion order by tying Mr. Archuleta's murder to Mr. Cisneros, plus its allegedly inappropriate statements about Mr. Cisneros during closing arguments; and (3) the district court abused its discretion by failing to conduct a full inquiry regarding the safety concerns of the entire jury panel.

## A.  *Reference to Mr. Archuleta's Murder*

Mr. Cisneros first contends that any testimony referencing Mr. Archuleta's murder should have been excluded under Federal Rule of Evidence 403.  "We review the district court's admission of evidence for abuse of discretion."  *United States v. Portilla-Quezada*, 469 F.3d 1345, 1353 (10th Cir. 2006).  In *Portilla,* we held it was not an abuse of discretion for a district court to admit evidence that a defendant's co-conspirator had been murdered when the court "limited the government from introducing evidence about the murder beyond the general nature of [the co-conspirator's] killing, and from naming [Defendant] as the gunman."  *Id*. at 1352.  Similarly, the district court here precluded evidence beyond the general nature of Mr. Archuleta's murder and stressed to the government that it would "not tolerate any attempt to link Defendant Cisneros to Mr. Archuleta's murder."  Rec., vol. 5 at 11.

We reasoned in *Portillo* that the murder was intrinsic evidence of the crime because it occurred during the life of the conspiracy.  *Portilla-Quezada,* 469 F.3d at 1353.  Likewise, the evidence of Mr. Archuleta's murder was intrinsic to the conspiracy because it was used to contextualize the evidence introduced at trial.

7

Importantly, the district court instructed the jury not to consider Mr. Archuleta's murder when determining whether the government had proven the elements of the crimes charged. "We presume jurors will remain true to their oath and conscientiously follow the trial court's instruction." *United States v. Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992).

The district Court did not abuse its discretion by admitting evidence of Mr. Archuleta's murder.

## B. *Alleged Prosecutorial Misconduct*

Mr. Cisneros contends the violations of the exclusion order by the government and the allegedly improper statements made by the prosecution during its closing rendered the trial so unfair as to result in the denial of his due process right to a fair trial. *See Greer v. Miller*, 483 U.S. 756, 765 (1987). We review allegations of prosecutorial misconduct de novo. *United States v. Sierra-Ledesma*, 645 F.3d 1213, 1227 (10th Cir. 2011). If there was prosecutorial misconduct, the government must demonstrate that it was harmless beyond a reasonable doubt. *Id.* "To determine whether prosecutorial misconduct is harmless, 'we must look to the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole.'" *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1134 (10th Cir. 2004) (quoting *United States v. Martinez-Nava*, 838 F.2d 411, 416 (10th Cir. 1988)).

We need not decide whether there was prosecutorial misconduct in this case because we conclude that any error was harmless beyond a reasonable doubt.

8

*See id.* First, the district court instructed the jury not once but twice that Mr. Archuleta's murder was unrelated to the charge against Mr. Cisneros. Second, the statements of the prosecutor in its rebuttal closing argument about which Mr. Cisneros complains were arguably in response to Mr. Cisneros' closing and constituted a very small part of the government's entire closing argument. Finally, there was substantial evidence, both direct and circumstantial, upon which the jury could find Mr. Cisneros guilty. *See id.*

With respect to the evidence of guilt, Mr. Cisneros attempts to discredit the testimony of Ms. Mendoza by pointing to the district court's comments during sentencing where it stated, "I will not hold Mr. Cisneros accountable for the quantities of drugs testified to by Ms. Mendoza during the trial in this case. . . . [because] I found Ms. Mendoza's demeanor during her trial testimony was troubling to me." Rec., vol. 6 at 27. However, "[i]t is not the role of an appellate court to consider the credibility of the witnesses or weigh the conflicting evidence, as these matters are within the exclusive province of the jury." *United States v. Magallanez*, 408 F.3d 672, 682 (10th Cir. 2005). Mr. Cisneros had an opportunity to attack Ms. Mendoza's credibility, and he did so vigorously. The jurors nevertheless apparently believed Ms. Mendoza's testimony—which was corroborated by Ms. Cole, Ms. Malmgren, and Ms. Chauarin—in regard to Mr. Cisneros' role in the conspiracy.

Mr. Cisneros also attempts to devalue the evidence against him by arguing that no drugs were ever seized from him. But he was charged with conspiracy,

9

and "the essence of a conspiracy is 'an agreement.'" *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) (quoting *Iannelli v. United States*, 420 U.S. 770, 777 (1975)). "The agreement need not be explicit, but may be inferred from the circumstances." *United States v. Rangel-Arreola*, 991 F.2d 1519, 1522 (10th Cir. 1993). Thus, Mr. Cisneros "is mistaken to believe that physical evidence is necessary to sustain a verdict." *Magallanez*, 408 F.3d at 681.

## C. Jury Panel Safety Concerns

Finally, Mr. Cisneros contends the district court erred by declining to question the entire jury panel regarding safety concerns, thereby violating Mr. Cisneros' Sixth Amendment right to an impartial jury. The Supreme Court has recognized the "wide discretion" owed to trial courts when it comes to jury-related issues. *Mu'min v. Virginia*, 500 U.S. 415, 427 (1991); *see also United States v. Gordon*, 710 F.3d 1124, 1155 (10th Cir. 2013) ("The district court has broad discretion in determining whether to excuse a juror for potential bias."). We therefore review a district court's response to a juror's safety concern for abuse of discretion. *See United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003).

To support his argument that the district court abused its discretion by not questioning the entire panel, Mr. Cisneros cites *United States v. Blitch*, 622 F.3d 658, 665-68 (7th Cir. 2010), which held that a district court's failure to conduct individual voir dire when multiple jurors expressed concerns for their safety was an abuse of discretion. But *Blitch* is easily distinguishable because there was ample evidence that all the members of the jury were discussing their concerns

10

with each other. *Id*. at 662. Conversely, in this case, the district court questioned the lone juror with safety concerns and asked if she had conveyed those concerns to any other juror, to which she replied "no." Rec., vol. 4 at 22. With no evidence that the rest of the panel was tainted by the single concerned juror in this case, we defer to the district court's determinations of jury impartiality, *see Skilling v. United States*, 561 U.S. 358, 387 (2010), and hold that it did not abuse its discretion when it declined to question the entire panel regarding safety concerns.

WE AFFIRM.[2]

Entered for the Court

Stephanie K. Seymour
Circuit Judge

---

[2] We deny Appellant's Motion to Strike Improper References in the Government's Answer Brief.

11