FILED
United States Court of Appeals
Tenth Circuit

June 24, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

KELVIN B. SCOTT, JR.,

Defendant-Appellant.

No. 07-6111

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CR-04-75-F)**

David Autry, Oklahoma City, Oklahoma for Defendant–Appellant.

Sanford C. Coats, Assistant United States Attorney (John C. Richter, United States Attorney, and Rozia M. McKinney-Foster, Assistant United States Attorney, with him on the brief), Oklahoma City, Oklahoma for the Plaintiff–Appellee.

Before **LUCERO**, **MURPHY**, and **HARTZ**, Circuit Judges.

**LUCERO**, Circuit Judge.

Kelvin B. Scott, Jr., appeals a sentence of 120 months' imprisonment, on

his conviction, based on a plea of guilty, of one count of transporting a minor

across state lines in violation of the Mann Act, 18 U.S.C. § 2423(a). Scott argues that the district court (1) violated due process and abused its discretion in calling and questioning a witness at his sentencing hearing; (2) entered a procedurally unreasonable sentence because it erroneously applied sentencing enhancements for an "unusually vulnerable victim" and a "leadership role"; (3) impermissibly varied upward, resulting in a substantively unreasonable sentence; and (4) violated ex post facto principles inherent in the Due Process Clause because Scott's sentence would have been "inconceivable" under the mandatory United States Sentence Guidelines ("Guidelines") scheme in effect at the time of the crime. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm.

## I

In January 2003, S.H., a 13-year-old girl, ran away from home. On the same day that she left home, Scott and "Obsession,"[1] a prostitute in his employ, approached S.H. on an Oklahoma City street. Scott, who was driving, and Obsession were in Scott's vehicle. They asked S.H. if she liked to drink alcohol and smoke marijuana. When she replied that she did, Scott and Obsession showed her a bottle of alcohol in the car. S.H. told them both that she was 13

_____

[1] Law enforcement officials involved in the case were never able to identify this individual by her legal name. Although she is referred to as both "Orgasm" and "Obsession" in the record, we will refer to her as "Obsession" for consistency.

years old and a runaway. They enticed her with an offer of "nice clothes and money in your pocket" and a "better life" and told her that she could live with them.

Upon Scott and Obsession's invitation to a party somewhere in town, S.H. got into the vehicle with them. Instead of remaining in the city, however, Scott drove S.H. to Amarillo, Texas, about 250 miles away. On realizing that they were leaving Oklahoma City, S.H. became frightened, but was reassured by the explanation that they were going to Amarillo to visit Obsession's mother.

When the three arrived in Amarillo, Scott told S.H. that he expected her to work as a prostitute. S.H. was instructed to earn $500 to $1,000 per night and charge $40 to $90 for various sexual acts. Obsession provided S.H. with "ho clothes" and taught her how to be a prostitute. The two worked together at a truck stop in Amarillo for a week. S.H. used the street name "Strawberry" and began earning $200 to $400 per night. Proceeds were collected by Obsession and handed over to Scott. Before meeting Scott and Obsession, S.H. had not worked as a prostitute.

After about a week in Texas, the three returned to Oklahoma City. Scott ordered S.H. to continue working for him at a local truck stop, but she refused and ran away. S.H. then attempted to work independently but eventually came under the employ of another pimp. She worked as a prostitute for a total of three to four weeks.

Contemporaneously, the Federal Bureau of Investigation ("FBI") was conducting a large-scale investigation of Oklahoma City prostitution. One of the agents involved, Mike Beaver, learned that a minor nicknamed "Strawberry" was engaged in prostitution, and eventually met and interviewed her. The investigation revealed that over a period of roughly one year, Scott employed at least five prostitutes, including S.H. and Obsession. One of these women, B.U., was a juvenile, and two others, Katharine Schroeder and Casey Pipestem, were adults.[2] At the time of S.H.'s employment, Obsession was Scott's lead prostitute.

In June 2004, Scott was charged by superceding indictment of four counts: (1) transporting an adult, Schroeder, in interstate commerce for purposes of prostitution in violation of 18 U.S.C. § 2421; (2) transporting a juvenile, S.H., in interstate commerce for purposes of prostitution in violation of § 2423(a); (3) recruiting S.H. to engage in a commercial sex act in violation of § 1591(a); and (4) recruiting another juvenile, B.U., to engage in a commercial sex act in violation of § 1591(a). All counts also included a charge of aiding and abetting in violation of § 2.

After negotiating an agreement with the government, Scott pleaded guilty on August 9, 2004, to Count Two, transporting S.H. across state lines for purposes of prostitution and aiding or abetting this offense. Scott's plea

---

[2] There is also mention in the record of a prostitute in Scott's employ who went by the name of "Sensation." It is unclear whether this nickname refers to one of the five women listed above.

agreement specifically listed the sentence enhancing factors on which the government expected to rely at sentencing, including the victim's age and the use of coercion in the offense. Accordingly, the presentence report ("PSR") showed that Scott's crime carried a base offense level of 19, see U.S.S.G. § 2G1.1(a)(1) (2003),[3] but added four levels for the use of fraud in a commercial sex act, see § 2G1.1(b)(1), and two additional levels because Scott's victim was between the ages of 12 and 16, see § 2G1.1(b)(2)(B). Two levels were subtracted for acceptance of responsibility, see § 3E1.1(a), leaving a final offense level of 23. This offense level, combined with a criminal history category of I, resulted in an advisory Guidelines sentencing range of 46 to 57 months' imprisonment.

Before the sentencing hearing, the district court ordered briefing on the applicability of two sentencing enhancements not mentioned in the PSR: a two-level enhancement for S.H.'s unusual vulnerability, under § 3A1.1(b)(1), and a two-level enhancement for Scott's role as a leader or manager in the offense, under § 3B1.1(c). At the hearing, the government called Agent Beaver, who had

---

[3] Section 2G1 of the Guidelines was amended effective November 1, 2004, after Scott's offense but before his sentencing. Among other things, the amendment increased the base offense level for a commercial sex act involving a minor from 19 to 24. Compare § 2G1.1(a)(1) (2003), with § 2G1.3(a) (2004). Because this amendment would have increased Scott's penalty, the district court properly sentenced him using the Guidelines manual in effect at the time of his offense. See § 1B1.11; see also United States v. Thompson, 518 F.3d 832, 868, 870 (10th Cir. 2008) (when a district court must apply a section of the Guidelines as it existed at the time of the offense due to ex post facto concerns, it must apply the entire Guidelines manual applicable at the time of the offense). Unless otherwise noted, citations in this opinion are to the 2003 Guidelines.

interviewed S.H. some 10 to 12 times during and after the FBI investigation, to testify in support of these enhancements. The court determined that both enhancements applied to Scott's conduct, resulting in a total offense level of 27 and an advisory range of 70 to 87 months' imprisonment. However, the government's motion for an upward departure for abduction under § 5K2.4 was denied on the conclusion that it would double-count the § 2G1.1(b)(1) fraud enhancement already applied.

The court then imposed an upward variance under 18 U.S.C. § 3553(a), and selected a sentence of 120 months' imprisonment. As its explanation for the variance, the court found that Scott employed several other prostitutes besides S.H., treated them cruelly, and acted as a pimp for approximately one year.

Scott appealed the sentence based in part upon the provision in his plea agreement which specified those facts upon which the government would rely as bases for sentencing enhancements, arguing that this list implied an agreement by the government not to argue for additional enhancements. In this earlier appeal, we concluded that the government had breached the agreement by advocating for additional enhancements at sentencing, and vacated Scott's sentence. United States v. Scott, 469 F.3d 1335 (10th Cir. 2006). On remand, the district court advised it would consider imposing vulnerable victim and leadership role enhancements as well as an upward variance. The court then held two hearings, one evidentiary and the second for sentencing.

At the evidentiary hearing in March 2007, the court explained that it would not consider evidence previously presented by the government in violation of the plea agreement. Noting that "the government's hands are tied" in terms of presenting evidence supporting the vulnerable victim and leadership role enhancements, the court, on its own initiative, called Beaver as a witness. Scott objected on constitutional due process and abuse-of-discretion grounds, but the court overruled his objection. In response to the court's questioning, Beaver testified at length about the circumstances of Scott's offense and about S.H.'s personal characteristics, including drug use, institutionalization for mental health treatment, and a habit of self-mutilation. Scott's counsel then cross-examined Beaver and called three of Scott's family members as mitigation witnesses. Throughout the hearing, counsel presented extensive argument challenging the two enhancements and any upward variance.

At the second hearing, in April 2007, the court entered factual findings and imposed a sentence. The court stated:

> In situations in which the agent's testimony is received and is not opposed with substantial countervailing testimony, I do tend to listen with special skepticism to the testimony of the agent. The purpose of the sentencing hearing is not to let one side or the other run up the score from an evidentiary standpoint, but to fairly ascertain the relevant facts and that is the approach I have taken in considering and analyzing the testimony of Agent Beaver. I did not hear Agent Beaver's testimony with an uncritical ear and I have not evaluated his testimony with an uncritical mind.

Concluding that Beaver's testimony was credible, the court proceeded with its detailed factual findings. Relevant to the enhancements at issue, the court concluded that S.H. was a vulnerable victim and that Scott was a leader or manager, and again imposed the corresponding sentence enhancements. Scott renewed his procedural objection, arguing that "factually and legally neither of these additional enhancements apply."

Scott then addressed the § 3553(a) sentencing factors at length, contending that the case was not so unusual as to warrant an above-Guidelines sentence. The court again found that the upward variance previously imposed was appropriate. Scott's sentence was set at 120 months.[4]

Following sentencing, the court issued a lengthy written sentencing decision fully exploring the law and facts supporting the two enhancements and upward variance. Scott now appeals the sentence.

## II

Scott challenges the district court's decision to call Beaver as a witness and to question him regarding the leadership role and vulnerable victim sentencing enhancements. Scott argues that the court's actions were impermissible for two reasons: (1) The court showed partiality to the government, thus denying Scott

---

[4] The court also stated that it would impose the same ultimate sentence even absent the two additional Guidelines enhancements. Because we affirm the district court's application of these enhancements, we need not consider the validity of this alternative justification.

his due process right to an impartial tribunal; and (2) The court abused its discretion to call outside witnesses by assuming the role of an advocate. We consider each argument in turn.

**A**

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement . . . . preserves both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done . . . ." Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980) (quotation omitted). "To demonstrate a violation of due process because of judicial bias, a claimant must show either actual bias or an appearance of bias." United States v. Nickl, 427 F.3d 1286, 1298 (10th Cir. 2005) (citation omitted).

Scott argues that by calling Beaver to testify, the district court abandoned judicial impartiality, or at least appeared to do so. He emphasizes that the court stated that it called Beaver because the plea agreement prohibited the government from doing so itself, and argues that this statement shows bias in favor of the government. He also objects to the content of the court's questions, which he claims demonstrate the court's partiality because the questions primarily elicited facts supporting the enhancements.

We conclude that the court did not violate Scott's due process rights by calling Beaver to the stand. Although Beaver had appeared as the government's

witness at the earlier trial, he was also the individual best able to testify about the circumstances of Scott's crime. Admittedly, Beaver's testimony countered Scott's arguments against an increased sentence, but a judge does not show actual bias simply by calling a witness whose testimony proves more helpful to one party than the other.[5] As we have stated previously, "it is no ground of complaint that the facts [developed during judicial questioning of a witness] may hurt or help one side or the other." United States v. Albers, 93 F.3d 1469, 1486 (10th Cir. 1996) (quotation omitted); see also United States v. Campino, 890 F.2d 588, 592 (2d Cir. 1989) ("By seeking additional evidence . . ., the court in no way displayed a predisposition towards the government's position.)"

Nor did the court's questions to Beaver show actual partiality. Although the court often asked leading questions, this by itself does not demonstrate impermissible bias. A district court "may ask a leading question," United States v. Wheeler, 444 F.2d 385, 390 (10th Cir. 1971), and in general it "has the power . . . to interrogate witnesses in a manner reasonably thought to bring about a just result," United States v. Cheatwood, 575 F.2d 821, 826 (10th Cir. 1978). The record suggests that the court's questions may have betrayed some impatience

---

[5] We reject Scott's allegation that the district court shifted the burden of proof from the government to Scott merely by calling a witness whose testimony tended to support sentencing enhancements. Cf. United States v. Guzman, 318 F.3d 1191, 1197-98 (10th Cir. 2003) (holding that a district court shifted the burden of proof away from the government by accepting disputed and unsupported factual statements in a PSR).

with eliciting testimony already heard in the prior hearing, but they do not indicate that the court prejudged whether the two enhancements should apply.[6]

Finally, the court was careful to mitigate any perception of bias that could have arisen from calling and questioning Beaver. The sentencing court stated that it had listened to Beaver's testimony with "special skepticism" because of the lack of countervailing evidence and that Beaver was "assuredly not the Court's own witness." Because Scott has not demonstrated bias or an appearance of bias by the sentencing court, his due process challenge fails.

**B**

We turn to Scott's assertion that, even if it did not violate due process, the district court abused its discretion in calling and questioning Beaver. Federal Rule of Evidence 614(a) provides that a district court "may, on its own motion or at the suggestion of a party, call witnesses . . . ." Calling Beaver to testify at the sentencing hearing, the district court cited this rule, and both Scott and the government base their arguments on cases decided under the rule. By their own

---

[6] As Scott noted at oral argument, we generally remand for resentencing in front of a different judge when a plea agreement is breached, United States v. VanDam, 493 F.3d 1194, 1206 (10th Cir. 2007), but did not do so in his previous appeal, Scott, 469 F.3d. at 1340. As VanDam explains, "[a]rguably, a defendant may be more likely to receive the same sentence if the judge is the same." 493 F.3d at 1205 n.7. Scott has raised no argument, however, that the prior panel's failure to remand to a different judge led to "per se" bias against him at resentencing. Nor did he request resentencing before a different judge from the panel that heard his prior appeal.

terms, however, the Federal Rules of Evidence do not apply to sentencing hearings. Fed. R. Evid. 1101(d)(3). Nor does Federal Rule of Criminal Procedure 32, which governs sentencing, specifically provide a basis for the court's action; this rule states only that "[t]he court may permit the parties to introduce evidence," including witness testimony. Fed. R. Crim. P. 32(i)(2) (emphasis added). Accordingly, we must look elsewhere to determine whether a sentencing court has the power to call and question a witness.

We need not look far. The Supreme Court has recognized a "longstanding principle that sentencing courts have broad discretion to consider various kinds of information" relevant to the sentencing decision. United States v. Watts, 519 U.S. 148, 151 (1997). This principle is codified at 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information . . . which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." In United States v. Garcia, we held that a district court "acted well within [its] discretion" in calling two witnesses to confirm information raised in the PSR, rather than relying exclusively on facts stipulated by the parties. 78 F.3d 1457, 1462-63 (10th Cir. 2006). Moreover, in addressing this issue, we treated the calling of witnesses as part of the district court's obligation to gather information relevant to the sentencing determination. Id. at 1463 n.6 (holding that a sentencing court "must establish the relevant facts" even where there is no factual dispute between the government and the defendant); see

also United States v. Doe, 398 F.3d 1254, 1260 (10th Cir. 2005) (quoting United States v. Lara-Velasquez, 919 F.2d 946, 955 (5th Cir. 1990), for the proposition that "[t]he sentencing judge has an obligation to consider all the relevant factors in a case and to impose a sentence outside the guidelines in an appropriate case").

Scott argues that a sentencing court may only gather additional evidence related to issues of fact raised in the PSR.  Yet we can find no authority for such a limitation on a sentencing court's discretion.  See 18 U.S.C. § 3661; Fed. R. Crim. P. 32(i)(3)(B) (requiring a district court to rule on "any disputed portion of the presentence report or other controverted matter" (emphasis added)).  Cases cited by Scott indicate that a district court may gather evidence related to issues raised in the PSR, but these cases do not limit the evidence courts may consider to that category alone.  E.g., Garcia, 78 F.3d at 1462-63 (affirming a district court's decision to "call[] and examine[] witnesses to verify the accuracy of the [presentence] report").[7]  Even if Scott were correct, his PSR contained facts relating to both S.H.'s vulnerability and Scott's leadership role.  The court clearly

_____

[7] Scott also relies heavily on United States v. Gatewood, 370 F.3d 1055 (10th Cir. 2004).  This opinion, however, was vacated by Gatewood v. United States, 543 U.S. 1109, 1116 (2005).  Even if we were to consider our reasoning in Gatewood for its persuasive value, that opinion, like Garcia, merely stated that issues raised in the PSR can provide a basis for the district court to gather its own evidence.  370 F.3d at 1063.

- 13 -

had the authority to explore these aspects of the crime further, regardless of the probation officer's conclusion that they did not warrant additional enhancements.[8]

Having established that a district court has the power to call a witness at sentencing, we next consider whether the district court abused its discretion in doing so here. Although our precedents regarding a district court's discretion under Federal Rule of Evidence 614 are not directly applicable, the underlying principles are the same. See United States v. Whitehorse, 2000 WL 219967, at *1-2 (10th Cir. Feb. 25, 2000) (unpublished) (considering Rule 614 principles in reviewing a court's decision to question a witness in a sentencing hearing).[9]

In the Rule 614 context, we have cautioned that "[i]nterrogation of witnesses by a judge in a criminal case creates a unique risk that the judge will be perceived as an advocate," United States v. Orr, 68 F.3d 1247, 1250 (10th Cir. 1995), and that "in exercising this power [to question witnesses] a judge must take care not to create the appearance that he or she is less than totally impartial,"

---

[8] Quoting the Supreme Court's opinion in Quercia v. United States, 289 U.S. 466, 470 (1933), Scott maintains that Beaver's questioning was improper because a judge "may analyze and dissect the evidence, but he may not either distort it or add to it." Scott misunderstands the meaning of the Court's statement. As discussed, a district court judge clearly has the power to call witnesses who will "add to" the available evidence. Quercia stands for the unrelated proposition that a judge may not "add to" the evidence by becoming the source of information not in the record. See id. (holding that the judge "may not assume the role of a witness").

[9] Unpublished opinions are not binding precedent, but may be relied upon for their persuasive value. 10th Cir. R. 32.1. We cite Whitehorse for its persuasive value only.

Albers, 93 F.3d at 1485-86.[10]  For the reasons discussed above, we conclude that the district court took sufficient precautions guarding against the risk of appearing biased.  Moreover, "[t]he record reflects that had the court not pursued its interrogation, the search for truth may not have been served."  United States v. Latimer, 548 F.2d 311, 314 (10th Cir. 1977).  The court did not exceed the bounds of its discretion in calling and questioning Beaver.

### III

Turning to Scott's challenges to the sentence he received, we review a district court's sentencing determination for reasonableness, asking whether the court abused its discretion in selecting the sentence imposed.  United States v. Smart, 518 F.3d 800, 805 (10th Cir. 2008).  "Our appellate review for reasonableness includes both a procedural component, encompassing the method by which a sentence was calculated, as well as a substantive component, which relates to the length of the resulting sentence."  Id. at 803.

Initially, we consider the procedural reasonableness of Scott's sentence. Gall v. United States, 128 S. Ct. 586, 597 (2007).  A district court must begin every sentencing proceeding by "correctly calculating the applicable Guidelines

---

[10]  We note that both Orr and Albers involved questioning of a trial witness before a jury, and that a display of judicial partiality at sentencing raises somewhat different abuse-of-discretion concerns from those present at trial.  At trial, the risk is that the court's authority will improperly influence the jury.  See, e.g., Orr, 68 F.3d at 1251 n.5 (noting that questions outside the presence of the jury "could not have influenced the jury [so] we do not address them").  Trial and sentencing share the risk of a perception of bias by the parties, however.

range." Id. at 596.  Any error in the Guidelines calculation renders a sentence

procedurally unreasonable and, if the error is not harmless, requires remand.

United States v. Todd, 515 F.3d 1128, 1134-35 (10th Cir. 2008).  Once we have

determined that a sentence is procedurally reasonable, we review for substantive

reasonableness, applying an abuse-of-discretion standard.  Smart, 518 F.3d at 805.

"Substantive reasonableness involves whether the length of the sentence is

reasonable given all the circumstances of the case in light of the factors set forth

in 18 U.S.C. § 3553(a)."  United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir.

2007).

## A

## 1

We begin with Scott's challenges to the procedural reasonableness of his

sentence.[11]  Section 3A1.1(b)(1) of the Guidelines provides that "[i]f the

defendant knew or should have known that a victim of the offense was a

vulnerable victim," his offense level must be increased by two levels.  Scott

contests the district court's conclusion that this enhancement applied to his

conduct.  In evaluating the application of a Guidelines enhancement, we review

"factual findings for clear error," but "to the extent the defendant[] ask[s] us to

interpret the Guidelines or hold [that] the facts found by the district court are

---

[11] The government argued in its briefs that Scott's plea agreement waived
his right to appeal this aspect of his sentence, but has since moved to withdraw
that argument.  We grant the motion.

insufficient as a matter of law to warrant an enhancement, we must conduct a de novo review." United States v. Checora, 175 F.3d 782, 788-89 (10th Cir. 1999).

Application Note 2 to the vulnerable victim guideline requires that the victim must be "unusually vulnerable due to age, physical or mental condition, or . . . otherwise particularly susceptible to the criminal conduct."[12] § 3A1.1 cmt. n.2 (emphases added); see also United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002). "The theory behind the vulnerable victim enhancement is that conduct against the particular victim or group of victims is more blameworthy than the conduct of other offenders and thus deserves greater punishment." United States v. Castaneda, 239 F.3d 978, 980 (9th Cir. 2001). Specifically, the enhancement should apply when the victim is "less able to resist than the typical victim," id., and "require[s] greater societal protection," Proffit, 304 F.3d at 1007. Accordingly, we have held that "the evidence must . . . distinguish the victim as atypical of the usual targets of the relevant criminal conduct." United States v. Caballero, 277 F.3d 1235, 1251 (10th Cir. 2002) (emphasis added); see also United States v. Shumway, 112 F.3d 1413, 1423 (10th Cir. 1997); United States v. Creech, 913 F.2d 780, 781-82 (10th Cir. 1990). In assessing vulnerability, the sentencing court must make an individualized determination; it is not enough that a victim belongs to a class generally considered vulnerable. Proffit, 304 F.3d at

---

[12] An application note to the Guidelines "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 508 U.S. 36, 38 (1993).

1007; see also United States v. Hardesty, 105 F.3d 558, 560 (10th Cir. 1997)

(although advanced age is insufficient to support the enhancement "without

more," the victims' "medical and physical needs as they advanced in years, and

their obvious inexperience in finances" made them unusually vulnerable to

embezzlement (quotation omitted)).

The application notes caution that the vulnerable victim enhancement

cannot be applied "if the factor that makes a person a vulnerable victim is

incorporated in the offense guideline"—that is, a particular characteristic cannot

be "double-counted" for purposes of the Guidelines calculation. § 3A1.1 cmt.

n.2; see also Checora, 175 F.3d at 794 ("Impermissible double counting or

cumulative sentencing occurs when the same conduct on the part of the defendant

is used to support separate increases under separate enhancement provisions

which necessarily overlap, are indistinct, and serve identical purposes."

(quotation omitted)). Therefore, S.H.'s young age cannot be taken into account in

determining her vulnerability, because her age provided the basis for a separate

two-level sentencing enhancement under § 2G1.1(b)(2). In other words, because

§ 2G1.1(b)(2) enhancement applies to all victims between the ages of 12 and 16,

to avoid double counting, S.H.'s vulnerability must be unusual even for

trafficking victims within this age range. The district court recognized this at

sentencing, emphasizing that it imposed the enhancement based on factors other

than age.

The district court provided two reasons for determining that S.H. was an unusually vulnerable victim. First, the court found that S.H. was unusually vulnerable to trafficking because of the following personal traits: (1) she was "exceedingly petite" and "fragile" for her age; (2) she was "naive," "[h]er communication skills were poor," and she was generally immature; (3) she was an intravenous methamphetamine user; (4) she had mental problems as evidenced by her self-mutilating behavior and later institutionalization; and (5) she had run away from home. Second, the court found that S.H. became even more vulnerable when Scott took her 250 miles to Amarillo, leaving her in "strange and unfamiliar surroundings." This circumstance, the court concluded, increased her dependence on Scott and her vulnerability to exploitation.

Scott does not disagree that S.H. possessed the aforementioned personal traits. Rather, he claims that he did not know nor should he have known about the victim's characteristics relied upon by the court, as required by § 3A1.1. In addition, even if he knew or should have known about these characteristics, Scott tells us, they are not sufficiently unusual, as a matter of law, to support the enhancement.

We ask first whether the court clearly erred in its factual findings regarding what Scott should have known. In reviewing Scott's knowledge, we recognize that "it is not a prerequisite that a defendant be aware of the victim's vulnerability at the time the defendant targets the victim; learning about the vulnerability

during the criminal episode is sufficient." Proffit, 304 F.3d at 1006. Based on the evidence before the district court, we conclude that only some of S.H.'s vulnerabilities would have been apparent to Scott during the criminal episode. We hold, however, that these remaining facts are sufficient to support the enhancement.

The district court found generally that S.H.'s "fragile condition" was "obvious to Kelvin Scott," and thus he should have known she was a vulnerable victim. S.H.'s physical stature assuredly would have been immediately evident to him. Although her naivete and poor communication skills may have been less obvious to Scott at first, the ensuing conversation would have revealed these vulnerabilities. If nothing else, S.H.'s agreement to get into a vehicle driven by two older, unknown individuals represented an abnormally trusting decision for a 13-year-old. Scott also knew that S.H. had run away from home, as this topic arose in their initial conversation.

Not all of the vulnerabilities found by the district court would have been quite so obvious to Scott, however. Regarding S.H.'s methamphetamine use, the district court found that Scott was aware that S.H. used "illegal drugs," but the evidence shows only that he knew she used marijuana and alcohol. As Beaver admitted during cross-examination, there is no indication in the record that Scott knew or should have known that S.H. used methamphetamine. Similarly, there is no suggestion that Scott knew of S.H.'s mental problems. In concluding that S.H.

suffered from mental illness, the court relied upon Beaver's testimony that S.H. practiced self-mutilation and was eventually institutionalized. But Scott could not have known of this eventuality at the time of their initial encounter. Nor does evidence in the record suggest that Scott had any other reason to doubt her mental state, including any notice of her habit of self-mutilation. See United States v. Myers, 481 F.3d 1107, 1110-11 (8th Cir. 2007). Beaver himself knew of this habit only because S.H. told him about it in interviews, and not because he witnessed any visible signs himself.

It may well be that during the course of Scott's subsequent employment of S.H., he became aware of her drug usage or her mental illness. But the law requires that he hold this knowledge at the time that he placed S.H. in his car and transported her across state lines, the offense for which he was convicted. See Proffit, 304 F.3d at 1006. Given that the record before us does not establish that her methamphetamine usage and mental illness were vulnerabilities of which Scott knew or reasonably should have known during the relevant time period, the district court's findings to the contrary were clearly erroneous. Accordingly, we may rely only upon S.H.'s physical vulnerability, immaturity, and runaway status in reviewing the applicability of the vulnerable victim enhancement.

Starting with S.H.'s status as a runaway, we recognize that the district court did not simply rely on runaway status as a "per se" indicator of vulnerability. See Proffit, 304 F.3d at 1007. Instead, the court found that it increased S.H.'s

vulnerability to Scott's crime because it made his offer of "a better life" all the more appealing. This individualized finding of vulnerability, however, can support the enhancement only if it is unusual. The Ninth Circuit has reasoned that an unstable living environment alone cannot support the vulnerability enhancement for victims of Mann Act violations, among whom such instability is unfortunately common. See United States v. Williams, 291 F.3d 1180, 1195-96 (9th Cir. 2002) (overturning vulnerable victim enhancement based only on victim's runaway and drug user status), overruled on other grounds by United States v. Gonzales, 506 F.3d 940 (9th Cir. 2007). We agree that an unstable personal life is sufficiently common among Mann Act victims that S.H.'s runaway status cannot support the enhancement.

We conclude, however, that S.H.'s other personal characteristics were adequate for the district court to find that she was unusually vulnerable even among Mann Act victims. See, e.g., Williams, 291 F.3d at 1196 (upholding the enhancement for a victim whom the district court determined was unusually psychologically vulnerable based on specific findings of fact). S.H. was both particularly small and frail, and unusually naive and immature, for her age.[13] These features made her more vulnerable to Scott's crimes in several ways. Her

_____

[13] Although the district court did not explicitly conclude as much, its findings logically imply that S.H. was unusual compared to other trafficking victims; there is no reason to believe that minor Mann Act victims are generally smaller in stature than other children, or generally more or less naive.

small size would have made her more fearful of fleeing from Scott's vehicle or protesting her abduction once she had entered the car, and more likely to accept Scott's offer to leave the streets and live with him. Her naivete would lead her to inaccurately assess the risks of joining Scott and Obsession in the vehicle. We conclude that S.H.'s small physical size and her naivete rendered her unusually vulnerable to trafficking, compared to the average 12-to-16-year-old victim of such a crime.[14]

**2**

Section 3B1.1(c) of the Guidelines provides for a two-level enhancement "if the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving fewer than five participants. U.S.S.G. § 3B1.1 cmt. n.1. A "participant," in turn, must be "criminally responsible for the commission of the offense" even if he or she was not charged or convicted. Id. cmt. n.1. The district court concluded that Obsession, the prostitute who accompanied Scott, was a participant in his offense, and that Scott supervised her. Scott contends that Obsession was not a criminal participant, but simply another victim of his commercial sex trafficking activities.

---

[14] Because these factors are sufficient to support the enhancement, we need not address the district court's additional justification that S.H. was vulnerable because she was transported to Amarillo, as any error in its reasoning therein would be harmless. Todd, 515 F.3d at 1135 (applying harmless error review to errors in Guidelines calculation).

The Eighth Circuit has examined the application of § 3B1.1 in a similar Mann Act prostitution case. United States v. Jarrett, 956 F.2d 864, 867-68 (8th Cir. 1992). The Jarrett court reversed the district court's application of the enhancement, reasoning that although several prostitutes worked for the defendant, they "cannot be counted as participants unless they assisted in the unlawful transportation of others." Id. at 868 (quotation omitted). Relying on Jarrett, Scott claims that Obssession was not a participant because she "was simply along for the ride, and was as much a victim as S.H."

In contrast to the facts of Jarrett, the district court in this case recognized that Obsession had done far more than undertake her own prostitution activities under Scott's supervision. The court found that she participated in persuading S.H. to get into Scott's vehicle and reassured S.H. that they were merely visiting her mother when S.H. realized how far they were traveling. These findings were based on Beaver's testimony and were not clearly erroneous.

We further conclude that these findings are sufficient to support application of the enhancement as a matter of law. Because Obsession assisted in convincing S.H. to get into the vehicle, she was "criminally responsible" for the same offense as Scott. See § 3B1.1 cmt. n.1. Under the facts found by the district court, she could be convicted under 18 U.S.C. §§ 2423(a) & 2. To violate § 2423(a), a defendant must (1) transport the victim across state lines and (2) do so knowingly and with a purpose of illegal sexual activity, and (3) the victim must be a minor.

Id.; see also United States v. Meacham, 115 F.3d 1488, 1495 (10th Cir. 1997).

Section 2 allows a defendant to be convicted for aiding and abetting a violation

when the defendant "willfully associated himself with the criminal venture and

sought to make the venture succeed through some action of his own." United

States v. Isaac-Sigala, 448 F.3d 1206, 1213 (10th Cir. 2006). Obsession aided

Scott in transporting S.H. to Texas by encouraging S.H. to join them in the

vehicle and by reassuring her of the purportedly benign purposes of the trip. In

doing so, she willfully associated herself with his venture and acted in support of

it. She therefore qualifies as a "criminal participant" in the offense, because she

could be convicted of the same offense as Scott himself.

The enhancement also requires that Scott in fact supervised Obsession.

Scott does not appear to contest the district court's finding that he acted in such a

capacity, nor could he do so successfully. In order to qualify as a supervisor,

> one needs merely to give some form of direction or supervision to
> someone subordinate in the criminal activity. Among the factors
> which a court may consider are the defendant's exercise of decision
> making authority, the nature of participation in the commission of the
> offense, the recruitment of accomplices, the claimed right to a larger
> share of the fruits of the crime, the degree of participation in
> planning or organizing the offense, the nature and scope of the illegal
> activity and the degree of control and authority exercised over others.

United States v. Mandilakis, 23 F.3d 278, 280 (10th Cir. 1994) (quotations

omitted). Scott exercised decisionmaking authority regarding the overall

prostitution enterprise, setting earning requirements and choosing where the

women he employed would work. He also directed Obsession's participation in that enterprise, and claimed all fruits of the prostitution activities as his own.

Accordingly, Scott acted as a supervisor of at least one other criminal participant in his offense, and the district court did not err in applying a leadership enhancement under U.S.S.G. § 3B1.1(c). Scott's sentence was therefore procedurally reasonable.

**B**

This brings us to the substantive reasonableness of Scott's sentence considering the district court's decision to impose an upward variance. The district court relied on several factors to justify the variance, laying out its findings orally and in a lengthy written statement of reasons. Among these factors were: (1) Scott's related unconvicted conduct, which included trafficking several women other than S.H., including another juvenile; (2) the duration of Scott's prostitution activities, which continued for approximately one year; and (3) the "callousness and sheer cruelty" with which Scott treated S.H. and others in his employ.

Each of these factors is relevant to a district court's sentencing determination under § 3553(a). Most importantly, each indicates that the advisory Guidelines sentencing range did not fully account for the seriousness of Scott's offense. See § 3553(a)(2)(A). The court explained that the length of Scott's career as a pimp also showed that his abduction of S.H. was not aberrant

behavior. From this, the court found an increased need to deter Scott from undertaking similar behavior in the future and to protect the public by preventing future offenses. See § 3553(a)(2)(B) & (C). Scott stresses Beaver's testimony that none of the aforementioned factors are atypical for an individual engaged in the employment of prostitutes. But a district court is not required to find that a defendant is extraordinary in order to conclude that an individualized application of the § 3553(a) factors militates in favor of a different sentence than the Guidelines recommend. Smart, 518 F.3d at 808.

On the other side of the § 3553(a) balance, the court specifically indicated that it had paid careful attention to § 3553(a)(4) and (5), which require consideration of the advisory Guidelines range. The court concluded that it would have imposed an even higher sentence absent the benchmark provided by the Guidelines, thereby satisfying its obligation to give weight to the Guidelines as "a measure of national practice." Smart, 518 F.3d at 808. With this reasoning, the court also accounted for the need to avoid unwarranted sentencing disparities under § 3553(a)(6): By imposing a lower sentence than it would have imposed in a system without Guidelines, the court decreased the divergence between Scott's sentence and those imposed on other defendants.

In determining that the statutory factors warranted a longer sentence than the 87-month Guidelines maximum, the sentencing court did not abuse its discretion. The court relied upon a host of facts indicating that Scott's crime was

more serious than his Guidelines range suggested, and heeded § 3553(a)'s command to consider both the Guidelines and the importance of avoiding sentencing disparity. "Giv[ing] due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance," Gall, 128 S. Ct. at 597, we uphold the court's determination that a 120-month sentence of imprisonment struck the proper balance.

## IV

Finally, Scott argues that the district court's upward variance violated ex post facto principles. Because his crime was committed before United States v. Booker, 543 U.S. 220 (2005), gave district courts the discretion to vary from the Guidelines, he argues, a sentence so far above the Guidelines range was unforeseeable to him at the time he committed his crime. We review this legal issue de novo. Lustgarden v. Gunter, 966 F.2d 552, 553 (10th Cir. 1992).

Although the Ex Post Facto Clause of the United States Constitution applies only to legislative enactments, the Due Process Clause of the Fifth Amendment limits ex post facto judicial decisionmaking. See Rogers v. Tennessee, 532 U.S. 451, 456, 460 (2001). "Limits on ex post facto judicial decisions are based upon the core due process concepts of notice, forseeability, and, in particular the right to fair warning." United States v. Portillo-Quezada, 469 F.3d 1345, 1355 (10th Cir. 2006) (per curiam) (quotation omitted). Where a

defendant's "exposure to punishment" has not changed between his crime and his sentencing, due process is satisfied. Id. at 1355-56.

We have held that retroactive application of the Booker remedy generally does not violate these principles. United States v. Rines, 419 F.3d 1104, 1106-07 (10th Cir. 2005); see also Portillo-Quezada, 469 F.3d at 1354-56. Relying on a First Circuit case, however, Scott argues that his post-Booker sentence violated due process because it was "higher than any that might realistically have been imagined at the time of the crime." United States v. Lata, 415 F.3d 107, 112 (1st Cir. 2005) (discussing but not resolving this argument); see also United States v. Barton, 455 F.3d 649, 657 (6th Cir. 2006) (leaving open the same argument).

To understand the precise nature of Scott's argument, it is helpful to review the facts and reasoning of Lata. In that case, the defendant committed his crime and was sentenced shortly before the Booker decision. Lata, 415 F.3d at 109. His crime carried a statutory maximum penalty of 240 months' imprisonment, but his sentencing range under the mandatory Guidelines was only 70 to 87 months. Id. At sentencing, the court concluded (anticipating Booker) that the mandatory Guidelines scheme was unconstitutional and sentenced the defendant above the Guidelines range, to 96 months' imprisonment. Id. The First Circuit held that this sentence did not run afoul of ex post facto principles because it was "not wildly different than a sentence that might well have been imposed under the [mandatory] guidelines for someone with Lata's criminal record and offense-

related conduct." Id. at 112. Because "any prospective Guidelines range estimated before the crime has been committed is . . . contingent and uncertain," a defendant has notice of a broader range of sentences than only those within the Guidelines range as it is eventually calculated. Id.

However, the court left open an important question, declining to decide whether the 20-year statutory maximum provided sufficient notice of any possible punishment up to that maximum, even if such a sentence could not conceivably have been imposed under the mandatory Guidelines. Noting that it would be nearly impossible (absent "extremely aggravated characteristics" such as a felony murder) under the Guidelines for any defendant to actually receive a 20-year sentence for Lata's crime, the court "reserv[ed] for the future the case . . . in which a sentence is imposed for a pre-Booker crime that is higher than any that might realistically have been imagined at the time of the crime." Id.

Scott seeks to raise the hypothetical challenge left open in the First Circuit. Although his 120-month sentence is below the 180-month statutory maximum penalty in effect at the time he committed his crime, see 18 U.S.C. § 2423(a) (2002), Scott argues that the sentence is so far above the maximum Guidelines sentence of 87 months that the statutory maximum alone did not provide him with sufficient due process notice. We need not decide today whether such a challenge

might be viable under our own circuit's precedents,[15] because Scott had fair warning of his eventual sentence based on the terms of the Guidelines in effect at the time of his crime.[16]  Portillo-Quezada, 469 F.3d at 1355.  It is the Guidelines

_____

[15] Our precedent is less than clear about the availability of an ex post facto challenge to a defendant whose sentence was within the statutory maximum.  In Portillo-Quezada, we rejected an ex post facto sentencing challenge on the basis that "[t]he Supreme Court's decisions in Blakely and Booker did nothing to alter the statutory maximum sentence, and therefore did not alter Portillo-Quezada's exposure to punishment.  Thus, the sentence imposed in accordance with Booker does not offend ex post facto principles."  469 F.3d at 1355.  In United States v. Cachucha, however, we noted that although any ex post facto argument based on Booker "might appear to be foreclosed by" our precedents, none of these prior decisions involved a sentence higher than the Guidelines range, yet still within the statutory maximum.  484 F.3d 1266, 1269-70 (10th Cir. 2007) (citing Lata); see Portillo-Quezada, 469 F.3d at 1354 (defendant challenged only the imposition of a sentencing enhancement based on findings made by a preponderance of the evidence, but did not challenge any upward variance); United States v. Herula, 464 F.3d 1132, 1135 (10th Cir. 2006) (finding no ex post facto violation when a defendant's Guidelines range was 188-235 months and his sentence was 188 months); Rines, 419 F.3d at 1106 (finding no ex post facto violation when a defendant's Guidelines range was 70-87 months and his sentence was 70 months).  Thus, we have never squarely decided whether the statutory maximum alone provides adequate notice of any sentence up to that maximum, no matter how improbable the particular sentence might have been under the mandatory Guidelines.  But see United States v. Duncan, 400 F.3d 1297, 1304 (11th Cir. 2005) (holding that the statutory maximum sentence provided a defendant with "fair warning" that she could receive a sentence up to the specified maximum term).

[16] We reject the government's argument that the Supreme Court's decision to apply the Booker remedy to all cases on review forecloses the possibility that ex post facto principles might be violated in any such case.  See Barton, 455 F.3d at 657; cf. Rines, 419 F.3d at 1106-07 (10th Cir. 2005) (declining "Defendant's invitation to hold that the Supreme Court ordered us to violate the Constitution" where defendant argued that any application of the Booker remedy to crimes committed pre-Booker would be unconstitutional).

- 31 -

themselves that provided Scott with the requisite warning. This negates the question of whether the statutory maximum alone would have done so.

Scott could not have predicted at the time of his crime that he would receive a two-level downward adjustment for acceptance of responsibility (as he in fact did), because this adjustment is dependent on a defendant's behavior and decisions, and a court's evaluation thereof, after the crime takes place. See § 3E1.1(a) ("If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."); see also § 3E1.1 cmt. nn.1-3. Thus it was foreseeable that his crime of conviction could have resulted in an offense level of 29, rather than 27.

As the First Circuit noted in Lata, "[e]ven under mandatory guidelines, a defendant with a criminal record not fully reflected by criminal history points was always on notice that the top of his guideline range might be exceeded." 415 F.3d at 112. Section 4A1.3(a)(1) allows a district court to impose an upward departure, increasing a defendant's criminal history category if the history calculated under § 4A1.2 "substantially under-represent[ed] the seriousness of the defendant's criminal history." Specifically, "[p]rior similar adult criminal conduct not resulting in a criminal conviction" could lead to an upward departure. § 4A1.3(a)(2)(E). Like any fact supporting a sentencing determination, this conduct could be established by a preponderance of the evidence. See United States v. Magallanez, 408 F.3d 672, 683-85 (10th Cir. 2005). To determine how

much a defendant's criminal history category should be increased, a sentencing court was required to "us[e], as a reference, the criminal history category applicable to defendants whose criminal history . . . most closely resembles . . . the defendant's." § 4A1.3(a)(4)(A).

Had the district court chosen to apply § 4A1.3 in Scott's case, he would have been eligible for an upward departure. The district court found by a preponderance of the evidence that, prior to committing the crime of conviction, Scott employed several women as prostitutes, including one other juvenile. Based on these findings, the district court could have imposed an upward departure of at least three criminal history points based on Scott's unconvicted trafficking and recruiting activities. See, e.g., § 2G1.1 (providing a base offense level of 19 for trafficking convictions); Chap. 5 Pt. A (providing a minimum sentence of 30 months for level 19 offenses); § 4A1.1(a) (providing that 3 criminal history points should be added for each prior sentence of imprisonment exceeding 13 months).

Combining these two foreseeable possibilities, Scott's conduct and history could have led to a sentence under the mandatory Guidelines similar to the 120-month sentence he actually received. At offense level 29, the addition of even a single criminal history point would have subjected Scott to a Guidelines range of 97 to 121 months' imprisonment, and the addition of three points, a range of 108 to 135 months. Chap. 5 Pt. A. As this illustration shows, Scott's ultimate 120-month sentence in this case is not "higher than any that might realistically have

been imagined at the time of the crime," <u>Lata</u>, 415 F.3d at 112, and did not alter

his "exposure to punishment," <u>Portillo-Quezada</u>, 469 F.3d at 1355.  Thus,

imposition of a 120-month sentence did not violate Scott's due process rights.

**V**

For the foregoing reasons, Scott's sentence is **AFFIRMED**.